ADAM K. BULT, ESQ., Nevada Bar No. 9332
abult@bhfs.com
TRAVIS F. CHANCE, ESQ., Nevada Bar No. 13800
tchance@bhfs.com
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Telephone:    702.382.2101
Facsimile:    702.382.8135

*Attorneys for Plaintiff Sierra Summit, LLC*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

SIERRA SUMMIT, LLC,

    *Plaintiff*,

v.

HUMPHREYS & PARTNERS
ARCHITECTS, NEVADA, LLC,

    *Defendant*.

CASE NO.: 2:24-cv-01253

**COMPLAINT**

Plaintiff SIERRA SUMMIT, LLC ("**Owner**"), by and through its attorneys of record, the law firm of Brownstein Hyatt Farber Schreck, LLP, submits its Complaint against Defendant HUMPHREYS & PARTNERS ARCHITECTS, NEVADA, LLC ("**Architect**"), alleging and complaining as follows:

### PARTIES

1.    Owner is a limited liability company organized and existing under the laws of the State of Nevada, that is authorized to do, and is doing, business in Washoe County, Nevada.

2.    The members of Owner are citizens of the States of California and Nevada. Owner is, therefore, a citizen of California and Nevada.

3.    Architect is a limited liability company organized and existing under the laws of the State of Nevada.

4.    The members of Architect are citizens of Texas. Architect is, therefore, a citizen of Texas.

27680891

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction under 28 U.S.C. § 1332 because this is a civil action between citizens of different states (on the one hand, California and Nevada, and on the other, Texas) in which the amount in controversy exceeds $75,000, exclusive of costs and interest.

6.      Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Owner's claims occurred in this district and a substantial part of property that is the subject of this action is in this district.

## GENERAL ALLEGATIONS

### Owner Hires Architect To Design a Multimillion Dollar

### Apartment Complex in Reno, Nevada

7.      Architect is one of the largest multifamily architectural design firms in the United States.

8.      Upon information and belief, Architect and/or its parent and related companies have copyrighted several form multifamily housing designs. These formulaic designs are then deployed in jurisdictions across the country, which requires them to be closely reviewed and changed to meet owner requirements and to comply with the building codes of each local jurisdiction.

9.      In September 2016, Owner entered a contract with Architect to perform all professional architectural services for the construction of a multifamily, luxury apartment complex now known as INOVA ("**Project**").

10.     The Project spans about 26 acres and consists of 581 units of for-rent apartments, in addition to common area buildings.

11.     Architect knew the complexity of the Project and what the Project would demand of it. Indeed, the parties discussed, multiple times, that the Project would cost over $100 million, and included 155 affordable units within the 581 total units, that had special specification and construction requirements because they were to be funded from federal and state housing programs.

12.     Owner and Architect entered into five more services addenda to the original agreement, adding certain further design services in exchange for additional payment from Owner (each addendum together with the original September 2016 agreement, the "**Contract**").

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

13.    Under the Contract, Architect had to perform its architectural services in accordance with all applicable law and codes:

> 3.1.3 In providing the Architect's services, Architect will review applicable federal, state and local laws, rules, codes, and regulations applicable to the services, including without limitation, handicap access regulations, and other legal requirements that may govern and/or apply to performance of the services (collectively, "Laws"). Subject to the standard of care, the Architect shall prepare all Instruments of Services in compliance with such Laws and shall design the Project with the goal that when constructed in accordance with such design the Project shall comply with all such Laws.

14.    The Contract expressly obligated Architect to "perform its services consistent with the professional skill and care ordinarily provided by architects practicing in the same or similar locality under the same or similar circumstances," and "as expeditiously as is consistent with such professional skill and care and the orderly progress of the Project."

15.    Under the Contract, Architect had to do the following, among other things:

> 3.1.1 The Architect **shall manage and be responsible for the Architect's services**, consult with the Owner, research applicable design criteria, attend Project meetings, **communicate with members of the Project team** and report progress to the Owner.

> 3.1.2 The Architect **shall coordinate its services with those services provided by the Owner, the Owner's consultants and selected general contractor's design-build subcontractors**, if any. The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the Owner and the Owner's consultants and the selected general contractor's design-build subcontractors, if any. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any error, omission or inconsistency in such services or information.

> 3.3.3 Architect **will coordinate with Owner's consultants and selected general contractor's design-build subcontractors**, if any, for design coordination of systems.

> 3.6.4.4 Subject to the provisions of Section 4.3, the Architect **shall review and respond to requests for information** about the Contract Documents. The Architect shall set forth in the Contract Documents the requirements for requests for information. Requests for information shall include, at a minimum, a detailed written statement that indicates the specific Drawings or Specifications in need of clarification and the nature of the clarification requested. The **Architect's response to such requests shall be made in writing within any time limits agreed upon or otherwise with reasonable promptness**. If appropriate, the Architect shall prepare and issue supplemental Drawings and Specifications in response to requests for information.

27680891

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

16.     Architect was further obligated to "identify a representative authorized to act on" its behalf for the Project.

17.     Under The Contract, Architect is responsible for its "negligent acts or omissions."

18.     The Contract further provided that Architect must indemnify and hold Owner harmless from and against losses in connection with the Project related to actions attributable to Architect's negligence, including errors and omissions:

> 12.14.1 To the fullest extent permitted by law, ***Architect agrees to indemnify and hold harmless the Owner*** and each of its members, shareholders, directors, officers and employees (collectively, the "Indemnitees") ***from and against losses, liens, damages, liabilities, court costs and expenses, and reasonable attorneys' fees*** (collectively, the "Liabilities") ***to the extent caused by*** (i) the negligent performance of the services by the Architect or any of Architect's consultants; (ii) any negligent, reckless or intentionally wrongful act or omissions of, or any fraud, by the Architect or its employees or consultants relating to the services; (iii) ***the breach of any of the representations or covenants contained in this Agreement caused by the Architect's negligent performance*** of the services; and/or (vi) the failure by the Architect to timely cure any default of the Architect caused by the Architect's negligent performance of the services under this Agreement. Architect's obligation to pay for any of the Indemnitees' defense related costs shall arise only after a final determination of Architect's liability and, following any such determination of its liability, Architect shall be responsible to pay an amount of such costs equal to the finally determined percentage of liability based upon the comparative fault of the Architect.

### Architect's Negligent Design Phase Services

19.     After entering the Contract on September 1, 2016, Architect named Robert Finta as the architect of record and Elisabeth Stillson as architectural project manager.

20.     According to the Contract, Ms. Stillson was the "Project Architect / Project Contact," and is one of the representatives that Architect identified as being "authorized to act on behalf of the Architect with respect to the Project."

21.     Mr. Finta and Ms. Stillson are based in Dallas, Texas.

22.     Mr. Finta is a licensed architect.

23.     Ms. Stillson was a licensed architect but voluntarily surrendered her licensure in or around 2019.

/ / /

4

27680891

24.    In or around May 2017, Architect named Maricela Gomez as architectural project manager after Ms. Stillson took a leave of absence for health reasons.

25.    Ms. Gomez, however, was an unlicensed intern and was new to the more than $100 million Project.

26.    When Ms. Gomez was assigned to the Project, control of the plans was transferred to Florida, since she was based in Architect's Florida office.

27.    Over the next several months, Architect consulted Owner to implement significant changes to its copyrighted designs, going far beyond aesthetics. The ultimate plans prepared for submission to the City of Reno included major modifications to structural and other building systems, resulting in an entirely new set of building prototypes.

28.    Architect eventually submitted plans produced in Florida for permit applications in Nevada, with the City of Reno issuing its first round of plan-check comments and Architect issuing its responses.

29.    On or about August 10, 2017, K2 Engineering and Structural Design, LLC ("**K2**") was hired by Owner to provide engineering services for the Project. K2's services included structural drafting of the foundation plans, framing plans, and structural details and providing structural calculations for the same to submit to the City, all of which services depended on accurate architectural plans that should have incorporated all of the mechanical/electrical/plumbing ("**MEP**") plans, produced by Architect's consultants.

30.    Unfortunately, these plans were not consistently integrated into the architectural plans which critically impacted K2's foundation, framing, and structural plans, resulting in major conflicts, many change orders, cost increases, and months of delays.

31.    After the more than $100 million Project was managed by an unlicensed intern for more than six months, Ms. Stillson returned to the Project, replacing Ms. Gomez, on or around December 11, 2017.

32.    Days later, the City of Reno issued its second round of plan-check comments.

33.    On or about January 5, 2018, Architect issued its responses to the City of Reno's plan comments, which included architectural floor-plan layout changes. But Architect failed to

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1   include coordinated structural drawings and MEP drawings as required, which resulted in

2   conflicting plans that were not discovered until construction began.

3       34.    On February 2, 2018, Whiting-Turner Contracting Co. ("**WT**") was hired as the

4   prime contractor for the Project. WT engaged multiple construction subtrades to assist in its

5   construction of the Project.

6       35.    In early February 2018, the City of Reno issued its third round of plan-check

7   comments and Architect provided its responses.

8       36.    Also in or around February 2018, Architect removed Ms. Stillson from the Project

9   without explanation and without naming a replacement, leaving the design of a more than $100

10  million Project unsupervised.

11      37.    Owner complained directly to Greg Faulkner, President of Architect, that Ms.

12  Stillson was not responsive and Mr. Finta was not supervising the Project and/or performing or

13  causing Ms. Stillson to perform on necessary plan changes due to Architect's errors and omissions.

14      38.    During the approximate six-month period before February 27, 2018, Architect had

15  worked with its MEP consultants and key subcontractors for the Project from its Florida and then

16  Dallas offices, discussing the various reconciling changes necessary to the plans.

17      39.    Even with this detail and information in hand, many of those essential changes were

18  never timely implemented into the permit plan set or submitted for plan check.

19      40.    On February 27, 2018, Owner representatives traveled to Architect's Dallas office

20  to discuss and attempt to resolve Architect's production delays and errors. Those discussions

21  included Owner's instructions addressing all prior value engineering efforts Architect had not

22  effectively implemented into the coordinated plan sets. K2 participated in this meeting for several

23  hours by phone in order to ensure all plan-related issues were properly identified for Architect.

24  Architect concurrently promised to immediately provide the input to K2 which was necessary for

25  those corrections.

26      41.    At that meeting, Architect committed to building an effective team going forward,

27  with Mr. Finta and Ryan McLean jointly and personally leading the team, with a commitment of

28  their personal architectural focus.

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

6

42.     But Architect did not provide K2, immediately or after several additional requests, the complete architectural plans with all of the MEP modifications, and the corrections requested in the full day meeting with Owner.

43.     Despite its commitment and representations, on or about March 13, 2018, Architect named Erik Sanchez, another unlicensed intern, as the architectural project manager for the more than $100 million Project.

44.     Neither Mr. Finta nor Mr. McLean took responsibility for leadership or a consistent professional commitment to directing and reviewing the plans.

45.     Mr. Finta believed that he had too much work and he could not focus on the Project, even though Mr. Faulkner had assured Owner that Architect would expedite the necessary plan corrections.

46.     Architect continued to fail in providing K2 with architectural plans that included all of the MEP consultants' layouts for electrical, plumbing, and air conditioning, with subcontractor modifications that the MEP consultants had accepted.

47.     Architect's failure to have appropriately licensed personnel overseeing the Project, and instead using unlicensed interns, attempts to exclusively run the Project from offices outside Nevada, and failures to properly incorporate and coordinate changes to the plans were negligent. But those acts and omissions were made all the more negligent when considering that Architect was not simply updating its copyrighted plans to comply with local codes. It was required to implement significant changes to meet the requirements of Owner and governmental authorities that required far more time, care, and attention than what Architect committed to the Project.

48.     Moreover, WT's guaranteed maximum price agreement with Owner was based on plans that should have been, but were not, finished – indeed, they did not include the necessary above revisions and corrections.

/ / /

/ / /

/ / /

/ / /

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

**Architect's Negligent Design Errors and Omissions, And Continued Negligence During the Construction Phase, Caused Owner Significant Delays and Damages**

49.     On March 21, 2018, the City of Reno issued a permit for the Project.

50.     Just days after the permit was issued, WT began issuing requests for information ("**RFI**") to Architect, requesting clarifications and details about the plans.

51.     From around May 2018 through August 2018, Owner persistently reminded Architect of its prior instructions given during design development, including those from the February 2018 meeting in Dallas.

52.     Even still, Architect's errors and failures to properly revise the plans and incorporate value-engineering details continued.

53.     On or about August 31, 2018, Architect removed the then-project manager and unlicensed intern, Mr. Sanchez, from his post, assigning Christine Clary-Lackey as architectural project manager.

54.     Ms. Clary-Lackey, however, was a Certified Risk and Insurance Specialist – not a licensed or trained architect.

55.     During this time, Mr. Finta provided occasional architectural consultation on the Project.

56.     But the Project was largely left without competent and licensed oversight.

57.     On or around September 28, 2018, Architect finally submitted, and the City of Reno approved, value-engineered details.

58.     Despite the many conversations with Owner during design development the prior year, and Owner's reiteration of the need for Architect's proper, timely preparation of these details, Architect's submission of corrections to the City of Reno in September 2018 was problem-ridden.

59.     Critical information and details were missing and what information was included was not properly coordinated with the applicable plans.

60.     Indeed, Architect's MEP consultants had worked out modifications to their plans with WT's subcontractors, but these corrections and modifications were not provided to K2 to

Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

8

incorporate into their structural plans before the start of construction and they were not provided to the City in the September 2018 revised plan set submission.

61. Consequently, as of September 4, 2018, WT had issued around *117 RFIs* to Architect regarding missing and/or uncoordinated plan information.

62. By September 10, 2018, Architect had not provided stamped, approved architectural and structural drawings to WT.

63. WT notified Owner and Architect that it would need them by September 14, 2018, to avoid the loss of framing crews on the Project and to keep the critical path intact.

64. On September 24, 2018, Owner notified Architect of the dire need for Architect's responses to a multitude of RFIs and expediting final revisions and corrections to the plans for several building types. Owner informed Architect that if it did not timely complete this work, it would assuredly impact the construction schedule.

65. Having received no response by the next day and given the serious risk to its more than $100 million investment, Owner followed up with a plea to Architect for increased attention to responding to RFIs and finalizing revisions and corrections.

66. Ultimately, Architect's failure to timely correct building layout details delayed the approval of final structural framing plans from February 2018 through September 2018, for all 21 of the larger, three story buildings.

67. Architect's lack of consistent involvement in the Project was felt early in the construction phase and continued throughout. This lack of involvement caused WT to state on October 23, 2018, that "the [P]roject is proceeding with no direction or response from" Architect.

68. As of November 1, 2018, there were numerous outstanding RFIs, the answers to which were critical to keep the Project on schedule (or as close to as on schedule as possible).

69. Moreover, Architect not having a locally based project manager, and its decision to run the Project from offices located in other states, contributed to its delays in responding to RFIs.

70. Numerous requests required a physical visit to the active construction Project to resolve them comprehensively, thoroughly, and in a time and cost sensitive manner. Owner pleaded for Architect to make site visits, to walk the site with K2 and Owner, and to walk the site with WT

9

to resolve these critical issues delaying construction and resulting in major change orders. Architect would pledge to make a site visit and then state that its schedule had changed and it could not accommodate the visit.

71.    Architect did have a field inspector, an architect, but he would only show up for the draw meetings to verify percentage of completion, as he compared the work in place with the plans.

72.    He largely had no idea, and no proposed resolution of, the coordination issues with the MEP consultants, the plan corrections required from the pre-February 2018 meetings with the Owner, the Dallas meeting corrections, the failures of Architect to respond to many and continuing requests from the City of Reno Building Department, outstanding RFIs, change order requests, and/or any other issues with the plans.

73.    There was simply no internal coordination and no competent oversight by Architect for this complex Project.

74.    On or about December 7, 2018, after repeated requests by Owner to Architect to resolve about 50 outstanding RFIs, Owner reached out to a local architect, Jeffrey Frame Architecture, to help save the Project, given Architect's negligence.

75.    On February 5, 2019, Jeffrey Frame Architecture was hired to act as a consultant to provide timely and effective analysis and responses to the RFIs and other issues. Architect (HPA) remained as architect of record and handled administrative documentation.

76.    After receiving multiple costly change orders based on RFI responses, Owner notified Architect's executive offices of the dire state of the Project.

77.    In response, Architect assigned Principal Risk Management Director, Robin Bellerby, to assess the Project.

78.    The assignment of a risk manager to the Project was a tacit admission that Architect had not met its standard of care.

79.    Ms. Bellerby then named Mr. McLean as the project lead in place of Mr. Finta.

80.    With this change in leadership on the Project, Architect assured Owner that it would quickly resolve the ever-increasing RFIs.

/ / /

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

81.     As a result of Architect's assurances, Owner and Jeffrey Frame Architecture agreed to dissolve their consulting arrangement.

82.     On or about March 5, 2019, Architect removed Ms. Clary-Lackey from the Project after more than six months, naming Valon Maloku, yet another intern, as architectural project manager for this more than $100 million Project.

83.     Following Owner's consistent pleas for more timely and efficient responses to RFIs so as not to keep delaying progress on the Project's construction, Architect had made some headway in responding to those requests.

84.     Even still, many RFIs were outstanding as of April 29, 2019 (nearly all of which WT also noted would cause a delay in completion of the Project).

85.     So Owner again urged Architect to resolve the outstanding RFIs.

86.     With a significant number of RFIs still outstanding, Architect had failed to ensure that any plan changes required by answered RFIs were in fact integrated with the permit plan set on file with the City of Reno.

87.     This negligent error resulted in a City inspector threatening to shut construction down on May 31, 2019, unless it could be verified that RFI and other changes had been incorporated into the approved permit set of plans. Owner notified Architect of this issue the same day.

88.     The City of Reno ended up shutting down the Project many times that cumulatively impacted the Project by several weeks of delays.

89.     Owner implored Architect to resolve the inspection hold not only because it was causing a day-for-day delay in completion but there was also a likely risk of drywall installers and/or other subcontractors taking other jobs in the interim, which in fact happened, resulting in even more of a completion delay.

90.     Once the Project was up and running again, in August 2019, Mr. McLean was named architect of record for the Project, replacing Mr. Finta.  Mr. Finta left his employment with Architect at or around this time.

91.     By the end of September 2019, WT had issued *313 RFIs* and 361 change orders related to the Project.

11

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

92.    On January 22, 2020, WT emailed Owner to notify it that there were major completion delays, the largest of which was due to design of breezeway corridors. It also stated that because of the still outstanding RFIs, further delays were likely.

93.    By March 25, 2020, WT had issued *337 RFIs* and 453 change order requests.

94.    On May 6, 2021, WT recorded a Notice of Lien against the Property in the amount of $15,964,117.39.

95.    On August 13, 2021, Owner entered into a settlement agreement and mutual release with WT related to WT's claims for cost overruns and delays on the Project ("**WT Settlement**"). The basis of the vast majority of WT's cost overages and completion delays was Architect's faulty designs, errors, and omissions.

96.    On September 9, 2021, Owner recorded Notices of Completion, providing notice that the work of improvement on the Project was completed on September 7, 2021.

97.    The Project's actual completion date was delayed about one and a half years, due largely to the delays caused by Architect's errors, omissions, and other negligent acts described here.

98.    The delays in completing the Project because of Architect's errors, omissions, and other negligent acts described here also caused Owner to incur interest and lease up income losses.

99.    On January 10, 2022, K2 issued a substantial compliance letter, confirming that all structural components for the Project have been constructed in accordance with the structural plans.

**The Dispute Between Owner And Architect And Architect's Failure To Properly Participate In Pre-Litigation Mediation**

100.    Under the Contract, Architect was paid $864,720.56 for its services, services that were largely performed in a negligent manner for the reasons detailed here.

101.    Architect's negligence caused Owner to incur damages of over $14 million, which continue to accrue, related to: (i) increased construction costs because of Architect's plan errors and omissions; (ii) delays in the Project's completion; (iii) interest; and (iv) attorneys' fees and costs.

/ / /

102.    On August 10, 2022, Owner sent a Demand for Tender of Policy limits to Architect's insurer, asking the insurer to tender the policy limits of $2 million to Owner. The demand for Architect to tender its policy limits was because Owner's damages far exceed the limits of Architect's applicable insurance policies, based on: (i) the many errors and omissions giving rise to a series of change notices, design issues, and Architect's lack of coordination with other consultants on the design team; and (ii) Architect's delays in responding to RFIs, which impacted the Project's schedule.

103.    Architect and its insurer refused to tender the limits of its policy.

104.    On March 4, 2024, the parties participated in a mediation, a condition precedent the Contract requires before the initiation of this lawsuit.

105.    Owner was fully prepared and had obtained expert opinions on Architect's errors, omissions, and negligence, and Owner's resulting damages. These reports and a non-confidential version of Owner's mediation statement were provided to Architect long before the mediation date.

106.    Based on pre-mediation conferences with the assigned mediator, Owner understood that Architect would be obtaining rebuttal expert opinions and would provide those and its mediation statement to Owner, to allow for a productive mediation. None of those things occurred.

107.    Architect never obtained any rebuttal expert opinions, never provided Owner with its mediation statement, and never asked Owner for a single document related to the Project before the mediation date.

108.    Architect was, therefore, intentionally unprepared for the mediation.

109.    Due to Architect's failure to participate in the mediation process in good faith, no settlement was reached and this lawsuit was therefore necessary.

110.    There is a reasonable basis for filing this action, as described in the expert report that is attached to the attorney affidavit filed concurrently with this Complaint, in accordance with NRS 11.258.

/ / /

/ / /

/ / /

13

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

111.    Owner incorporates by reference the allegations contained in paragraphs 1 through 110, as though fully set forth below.

112.    The Contract is a binding and enforceable contract between Owner, on one hand, and Architect, on the other.

113.    Owner performed all of its responsibilities under the Contract, except where Architect's material breaches relieved Owner's obligation of further performance.

114.    Architect breached the terms of the Contract including, but not limited to, by:

a.    Persistently removing personnel from, and assigning new personnel to, the Project, including in the role of the Project's manager, in a negligent way, resulting in a lack of continuity of design personnel on the Project, breaching Section 2.3 of the Contract;

b.    Consistently using unlicensed interns and negligently failing to supervise them in their work breaching Section 2.2 of the Contract;

c.    Negligently failing to properly and timely coordinate building systems, including MEP systems, as appropriate for the progress of the Project, breaching Section 3.3.2 of the Contract;

d.    Negligently failing to properly and timely coordinate with Owner's consultants and WT for design coordination of systems, breaching Section 3.3.3 of the Contract;

e.    Negligently failing to properly and consistently coordinate its services with those provided by the Owner and the Owner's consultants, breaching Section 3.1.2 of the Contract;

f.    Negligently failing to review all applicable federal, state, and local laws, rules, and codes and to design the Project to comply with the same, breaching Section 3.1.3 of the Contract;

g.    Negligently failing to properly and timely incorporate the design

14

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

1    requirements of the City of Reno into the plans, breaching Section 3.4.2 of the
2    Contract;

3    h.    Negligently failing to timely and completely respond to the City of Reno's
4    instructions, questions, and deficiency lists, breaching Section 3.4.2 of the Contract;

5    i.    Negligently failing to visit the site of the Project during construction at
6    intervals appropriate for the stage of the Project, breaching Section 3.6.2.1 of the
7    Contract;

8    j.    Negligently failing to properly and timely review and respond to RFIs from
9    WT and other contractors during the construction phase, breaching Section 3.6.4.4
10   of the Contract; and

11   k.    Negligently failing to prepare and issue proper supplemental drawings and
12   specifications, timely, based on its responses to any RFIs when necessary, breaching
13   Section 3.6.4.4 of the Contract.

14   115.    As a direct and proximate result of Architect's negligent breaches of the Contract,
15   Owner sustained direct, consequential, and incidental damages in an amount in excess of
16   $75,000.00, with interest.

17   116.    Owner has been forced to retain counsel to prosecute this action and is thus entitled
18   to an award of attorneys' fees and costs as provided by the Contract and Nevada law

19                          **SECOND CAUSE OF ACTION**

20                          **BREACH OF IMPLIED COVENANT**

21   117.    Owner incorporates by reference the allegations contained in paragraphs 1 through
22   110, as though fully set forth below.

23   118.    In every contract, each party makes an implied covenant of good faith and fair
24   dealing to the other.

25   119.    The Contract is a binding and enforceable contract between Owner, on the one hand,
26   and Architect, on the other.

27   120.    Thus, Owner and Architect owed each other a duty of good faith and fair dealing.

28   121.    Owner has at all times acted in good faith with respect to Architect.

15

122.    Architect breached its duty of good faith including, but not limited to, by:

a.    Consistently and negligently providing unlicensed interns with management and supervisory authority over Architect's services for the Project and negligently failing to properly supervise those interns;

b.    Negligently attempting to exclusively run the Project from Architect's offices located in other states, such as Texas and, for a time, across the country in Florida;

c.    Negligently failing to ever have any qualified personnel on site, that also had full knowledge of the design issues, complaints from the City of Reno, plan code violations, change order requests, and other problems, during the construction phase of a multimillion dollar, complex construction Project; and

d.    Negligently using copyrighted, formulaic designs but failing to properly update them to comply with the current, applicable building codes.

123.    Architect's negligent conduct was unfaithful to the purpose and spirit of the Contract and departs from Owner's justified expectations thereunder.

124.    As a direct and proximate result of Architect's negligent breaches of the implied covenant of good faith and fair dealing, Owner has suffered direct, consequential, and incidental damages in an amount in excess of $75,000.00, with interest.

125.    Owner has been forced to retain counsel to prosecute this action and is thus entitled to an award of attorneys' fees and costs as provided by the Contract and Nevada law.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

126.    Owner incorporates by reference the allegations contained in paragraphs 1 through 110, as though fully set forth below.

127.    Architect, as a licensed design professional, owed Owner a duty of care to perform its design and related work on the Project in a manner that was consistent with the applicable standard of care.

///

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

128.   The applicable standard of care required that Architect, and its agents and subcontractors, perform its services under the Contract in accordance with the professional skill and care that ordinarily would be provided by architects practicing in the Reno, Washoe County, Nevada, area, and under the same or similar circumstances, on the same or a similar Project.

129.   The performance of Architect, and its agents and subcontractors, fell below the applicable standard of care, in that it was negligent in providing its design and related services by, among other things:

    a.    Persistently removing personnel from, and assigning new personnel to, the Project, including in the role of the Project's manager, resulting in a lack of continuity of design personnel on the Project;

    b.    Consistently providing unlicensed interns with management and supervisory authority over Architect's services for the Project and failing to properly supervise those interns;

    c.    Attempting to exclusively run the Project from Architect's offices located in other states, such as Texas and, for a time, across the country in Florida;

    d.    Failing to ever have any qualified personnel on site, that also had full knowledge of the design issues, complaints from the City of Reno, plan code violations, change order requests, and other problems, during the construction phase of a multimillion dollar, complex construction Project;

    e.    Failing to properly and timely coordinate building systems, including MEP systems, as appropriate for the progress of the Project;

    f.    Failing to properly and timely coordinate with Owner's consultants and WT for design coordination of systems;

    g.    Failing to properly and consistently coordinate its services with those provided by the Owner and the Owner's consultants;

    h.    Failing to review all applicable federal, state, and local laws, rules, and codes and to design the Project to comply with the same;

    i.    Failing to properly and timely incorporate the design requirements of the

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

17

City of Reno into the plans;

j.    Failing to timely and completely respond to the City of Reno's instructions, questions, and deficiency lists;

k.    Failing to visit the site of the Project during construction at intervals appropriate for the stage of the Project;

l.    Failing to properly and timely review and respond to RFIs from WT and other contractors during the construction phase;

m.    Failing to prepare and issue proper supplemental drawings and specifications, timely, based on its responses to any RFIs when necessary; and

n.    Using copyrighted, formulaic designs but failing to properly update them to comply with the current, applicable building codes.

130.    Architect's breaches of the applicable standard of care was the direct and proximate cause of the injuries complained of, and were the type of injury that Architect should have foreseen would result based on the breaches of its duty of care, including, but not limited to, the fact that Owner had to retain the services of a local Reno architect to help mitigate the harms caused by Architect's negligence.

131.    As a result of Architect's breaches of the applicable standard of care, Owner has suffered damages in an amount in excess of $75,000.00, with interest.

132.    Owner has been forced to retain counsel to prosecute this action and is thus entitled to an award of attorneys' fees and costs as provided by Nevada law.

## FOURTH CAUSE OF ACTION

## GROSS NEGLIGENCE

133.    Owner incorporates by reference the allegations contained in paragraphs 1 through 110, as though fully set forth below.

134.    Architect, as s licensed design professional, owed Owner a duty of care to perform its design and related work on the Project in a manner that was consistent with the applicable standard of care.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

18

135.    The applicable standard of care required that Architect, and its agents and subcontractors, perform its services under the Contract in accordance with the professional skill and care that ordinarily would be provided by architects practicing in the Reno, Washoe County, Nevada, area, and under the same or similar circumstances on the same or similar Project.

136.    The performance of Architect, and its agents and subcontractors, fell below the applicable standard of care, in that it was negligent in providing its design and related services by, among other things:

a.    Persistently removing personnel from, and assigning new personnel to, the Project, including in the role of the Project's manager, resulting in a lack of continuity of design personnel on the Project;

b.    Consistently providing unlicensed interns with management and supervisory authority over Architect's services for the Project and failing to properly supervise those interns;

c.    Attempting to exclusively run the Project from Architect's offices located in other states, such as Texas and, for a time, across the country in Florida;

d.    Failing to ever have any qualified personnel on site, that also had full knowledge of the design issues, complaints from the City of Reno, plan code violations, change order requests, and other problems,  during the construction phase of a multimillion dollar, complex construction Project;

e.    Failing to properly and timely coordinate building systems, including MEP systems, as appropriate for the progress of the Project;

f.    Failing to properly and timely coordinate with Owner's consultants and WT for design coordination of systems;

g.    Failing to properly and consistently coordinate its services with those provided by the Owner and the Owner's consultants;

h.    Failing to review all applicable federal, state, and local laws, rules, and codes and to design the Project to comply with the same;

i.    Failing to properly and timely incorporate the design requirements of the

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

19

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

City of Reno into the plans;

j. Failing to timely and completely respond to the City of Reno's instructions, questions, and deficiency lists;

k. Failing to visit the site of the Project during construction at intervals appropriate for the stage of the Project;

l. Failing to properly and timely review and respond to RFIs from WT and other contractors during the construction phase;

m. Failing to prepare and issue proper supplemental drawings and specifications, timely, based on its responses to any RFIs when necessary; and

n. Using copyrighted, formulaic designs but failing to properly update them to comply with the current, applicable building codes.

137. In the alternative and without prejudice to Owner's claim for negligence, Architect's negligence as described here demonstrates Architect's failure to exercise even a slight degree of care and a reckless disregard of the consequences of that conduct, such that Architect has committed gross negligence.

138. Architect's grossly negligent conduct is confirmed by:

a. the fact that Owner consistently notified Architect of its failures, requested corrections, and notified Architect that in the absence of such corrections the Project would be critically delayed and damaged;

b. WT's repeated and consistent notifications to Architect of its failures, lack of timely responses, and that in the absence of timely corrections, the Project would be critically delayed;

c. the City of Reno's repeated notifications to Architect of its failures, lack of timely corrections, and that in the absence of such corrections, the Project permits would be significantly delayed and/or construction would be shut down;

/ / /

20

27680891

d.    Architect's consistent use of unlicensed interns to manage the plan development, with the knowledge that the Project was suffering from extraordinary deficiencies, outstanding RFIs, and change order requests delaying construction and resulting in the City of Reno's Project shutdowns or threats of Project shutdowns; and

e.    Even in the face of such warnings, Architect's failures continued.

139.    Architect's grossly negligent breaches of the applicable standard of care was the direct and proximate cause of the injuries complained of and were the type of injury that Architect should have foreseen would result based on the breaches of its duty of care, including, but not limited to, the fact that Owner had to retain the services of a local Reno architect to help mitigate the harms caused by Architect's gross negligence.

140.    As a result of Architect's grossly negligent breaches of the applicable standard of care, Owner has suffered damages in an amount in excess of $75,000.00, with interest.

141.    Owner has been forced to retain counsel to prosecute this action and is thus entitled to an award of attorneys' fees and costs as provided by Nevada law.

## PRAYER FOR RELIEF

1.    For an award of direct, consequential, and incidental damages against Architect in an amount to be determined at trial for Architect's breaches of the Contract and breaches of the implied covenant of good faith and fair dealing contained in it;

2.    For compensatory damages against Architect for its negligent conduct, as described herein;

3.    For compensatory damages against Architect for its grossly negligent conduct, as described herein;

4.    For pre- and post-judgment interest as provided by the Contract and Nevada law;

5.    For an award of attorneys' fees and costs as permitted by the Contract and Nevada law; and

6.    For any other relief that this Court may deem just and proper.

/ / /

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

27680891

1

**DEMAND FOR JURY TRIAL**

2

Under FRCP 38, Owner demands a trial by jury on all issues and claims so triable.

3

DATED July 11, 2024.

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

4

5

BY: */s/ Travis F. Chance*

6

ADAM K. BULT, ESQ., NV Bar No. 9332
TRAVIS F. CHANCE, ESQ., NV Bar No. 13800

7

*Attorneys for Plaintiff Sierra Summit, LLC*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
702.382.2101

27680891