ADAM K. BULT, ESQ., Nevada Bar No. 9332
abult@bhfs.com
TRAVIS F. CHANCE, ESQ., Nevada Bar No. 13800
tchance@bhfs.com
CHELSEE C. JENSEN, ESQ., Nevada Bar No. 14549
cjensen@bhfs.com
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Telephone:    702.382.2101
Facsimile:    702.382.8135

*Attorneys for Plaintiff Sierra Summit, LLC*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| SIERRA SUMMIT, LLC, | CASE NO.: 2:24-cv-01253-JAD-MDC |
|---|---|
| *Plaintiff*, | **STIPULATION AND ORDER SETTING PROTOCOL FOR PRODUCTION OF ELECTRONICALLY STORED INFORMATION** |
| v. | |
| HUMPHREYS & PARTNERS ARCHITECTS, NEVADA, LLC, | |
| *Defendant*. | |

Plaintiff SIERRA SUMMIT, LLC ("**Plaintiff**"), by and through their undersigned counsel of record, and Defendant HUMPHREYS & PARTNERS ARCHITECTS, NEVADA, LLC ("**Defendant**," and together with Plaintiff, the "**Parties**"), by and through their undersigned counsel, hereby stipulate and agree that the following protocol shall govern the ongoing search and production of electronically stored information ("**ESI**") in this matter (the "**Protocol**").

**I.    GENERAL PRINCIPLES**

1. This Protocol is filed pursuant to, and shall augment, the production of documents and ESI, as described in and contemplated by FRCP 26, 33, and 34.

2. The proportionality standard set forth in FRCP 26(b)(1) must be applied in each case when formulating a discovery plan.

///

3. The Parties are aware of the importance this Court places on meaningful cooperation and commit to confer and cooperate in good faith throughout the matter.

4. Nothing in this Protocol is intended to supersede the provisions of any stipulated confidentiality agreement or protective order that may be entered in this case.

5. The Parties agree to use their best efforts to comply with and resolve any differences concerning compliance with any provisions of this Protocol. No Party may seek relief from the Court concerning compliance with this Protocol until it has met and conferred with the other Party pursuant to this Court's practice standards, requiring a good faith effort to resolve or narrow the area of disagreement.

## II. DEFINITIONS

The following protocol shall control the production of discoverable documents and electronically stored information when production commences.

a. The term "**Document(s)**" shall have the same meaning as used in the Federal Rules of Civil Procedure and case law in this district and from the Ninth Circuit Court of Appeals construing same. Unless otherwise set forth herein, issues concerning the production of Documents shall be resolved with reference to those rules and that case law.

b. The phrase "**Producing Party**" shall mean the Party producing Documents in response to any request for production of Documents pursuant to FRCP 34(a) or through an initial or supplemental production of Documents identified in the Party's Rule 26(a) disclosures.

c. The phrase "**Receiving Party**" shall mean the Party receiving production of Documents in response to any request for production of Documents pursuant to FRCP 34(a) or through an initial or supplemental production of Documents identified in the Party's Rule 26(a) disclosures.

d. The phrase "**Electronically Stored Information**" or "**ESI**" has the same meaning as in FRCP 26 and FRCP 34.

e. The term "**Metadata**" means: (i) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, (iii) information, such as Bates numbers, created during the course of processing documents or ESI for production, and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device on which it was stored, or the custodian or non-custodial data source from which it was collected.

f. The term **"TAR"** means and refers to Technology Assisted Review, as used in the AI context.

g. The term **"CAL"** means and refers to Continuous Active Learning, as used in the AI context.

h. The phrase "**Native Format**" means and refers to the format of ESI in which it was generated and/or as used by the Producing Party in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is a .xls or .xslx file.

i. The phrase "**Optical Character Recognition**" or "**OCR**" means the process of recognizing and creating a file containing visible text within an image.

j. The phrase "**Extracted Text**" means the native text extracted from an Electronic Document.

k. The phrase "**Load File**" means electronic files provided with a production set of documents and images used to load that production set into a Receiving Party's document review platform, and correlate its data within that platform.

3

     l.     The phrase "**Targeted Collection**" means the collection of documents from a specific source that is identified as likely to contain relevant materials (such as a specific e-mail or document folder containing documents related to the matter or similar source).

**III.**    **SCOPE**

    1.     The Parties shall conduct discovery in a cooperative manner, including without limitation, by reasonably drafting discovery requests and responses in accordance with FRCP 1 and 26(g)(l); producing ESI in accordance with FRCP 34; and by meeting and conferring in good faith on topics such as identification of custodians of relevant ESI, potentially relevant data sources, search methodologies, and such other issues as may arise during the course of discovery. Nothing in this Protocol establishes any agreement as to either the temporal or subject matter scope of discovery in this action.

    2.     The Parties shall not be obligated under this Protocol to produce any ESI that is no longer within their possession, custody or control (*i.e.,* lost or deleted) as a result of the good-faith operation of an electronic information system or document retention policy, unless the Party requesting such ESI establishes that there is good cause to believe that the Party from whom such ESI is being requested intentionally or recklessly failed to preserve, deleted, or destroyed the ESI while under an obligation to retain it.

    3.     The Parties shall meet and confer to resolve any disputes that arise under this Protocol. In the event the Parties cannot reach agreement on a disputed matter, a Party may submit the matter to the Court.

**IV.**    **ESI DISCOVERY PROCEDURES**

    1.     **Relevant ESI Sources.**  To the extent that the parties identify relevant systems for potential production, the Parties agree to produce responsive, relevant, non-privileged documents from those systems.

    2.     The Parties agree that third parties are likely to have ESI relevant to this matter and of which the Parties do not have possession, custody, or control as defined in the Federal Rules of Civil Procedure and interpreting case law, including but not limited to: subcontractors, engineers,

surveyors, construction/project managers or superintendents, inspectors, electricians, plumbers, carpenters, and other design/construction professionals.

      3. The Parties identify the following data sources that are or were likely to contain discoverable ESI that a Party asserts may not be reasonably accessible or recoverable under FRCP 26(b)(2)(B):

          a. Email and .PST data purged as the result of the good-faith operation of an electronic information system or document retention policy.

      4. **Discovery of ESI.** Each Party shall conduct diligent searches of all reasonably accessible sources that it has reason to believe may contain ESI responsive to the opposing Party's discovery requests. Reasonably accessible sources of ESI include, but are not limited to, computer hard drives, shared network drives, remote servers, cloud-based storage, and other storage devices and media, including CD-ROMs, DVDs, external hard-drives, and flash drives. The Parties agree that they shall not be required to conduct searches of electronic back-up systems (unless reasonably accessible and relevant data can be extracted) or mobile devices (unless reasonably accessible and relevant data can be extracted and it is shown the data cannot be obtained from other sources), except by order of the Court on good cause shown.

      5. **Custodians.** In an effort to expedite the discovery process and alleviate burdens on the Parties in collecting, reviewing, and producing ESI, the Parties agree to limit the collection of ESI by first exchanging lists of custodians from which ESI is to be collected, reviewed, and produced. The Parties agree to exchange their respective lists of custodians within two weeks of executing this Protocol. The Parties further agree that, based on currently available information and the scope of Plaintiff's claims, it is not necessary to identify other specific custodians of the Parties from which ESI may be collected. This initial agreement notwithstanding, either Party may propose to identify additional custodians during the course of discovery and, in the event a Party determines that there is good cause to believe that additional custodians may possess or control potentially relevant information, counsel will meet and confer to discuss the additional specific custodians. If the Parties cannot agree whether to include the specific custodians beyond those from which the

5

Parties collect ESI for possible production in this case, either Party may seek relief from the Court pursuant to Rule 26(b)(2).

6. **Search Parameters.** The Parties agree that, based currently available information and the scope of Plaintiff's claims, it is necessary to identify particular search terms to use in collecting relevant ESI. The Parties agree to exchange their respective proposed search terms within two weeks of executing this Protocol. As discovery proceeds, the Receiving Party and the Producing Party shall meet and confer as needed on whether additional search terms should be used on certain sets of data to identify potentially relevant ESI and any date filters to be used on such collections. If they so agree, then the Parties shall meet and confer regarding the search terms to be used. If the Parties cannot agree, either Party may seek relief from the Court pursuant to Rule 26(b)(2).

7. **TAR/CAL Search Process.** The Parties agree that they will meet and confer should a Party decide to utilize TAR/CAL to exclude potentially responsive documents from review or production. Should any Party decide to use TAR for this purpose, the Parties agree that the producing Party will disclose: (1) the identity of the TAR/CAL software it intends to utilize, including how it will train the algorithm, such as using exemplars, keyword search strings, or some other method; (2) a general description of how the TAR/CAL process will work; (3) what quality control measures will be taken; and (4) a general description of the categories or sources of the documents included or excluded from the TAR/CAL process. The Parties agree that once the producing Party has provided the TAR/CAL disclosure indicated above, they will meet and confer to discuss any concerns that the receiving Party may have with the proposal. The producing Party will consider any requests to increase the accuracy of the TAR process the receiving Party may offer.

8. The collection of ESI by the Parties shall continue to be by self-collection by the Parties via appropriate ESI source administrators. In searching non-structured database sources (e.g., emails, .PST files, etc.), the Parties will do self-collection in accordance with Section IV, Paragraph 6.

///

### V. PRESERVATION OF ESI

The Parties acknowledge they have an obligation to take reasonable and proportional steps to preserve discoverable information in their possession, custody, or control that is relevant to the claims and issues in this litigation. With respect to ESI preservation, the Parties agree as follows:

1. Absent a showing of good cause by the Requesting Party, the Parties shall not be required to modify the procedure used by them in the ordinary course of business to back-up and archive data; provided, however, the Parties shall preserve all discoverable ESI in their possession, custody, or control, unless excepted herein.

2. Absent a showing of good cause by the requesting party, the following categories of ESI need not be preserved:

    a. Deleted, slack, fragmented, or other data only accessible by forensics.

    b. Random access memory (RAM), temporary files, or other ephemeral data that is difficult to preserve without disabling the operating system.

    c. Data in metadata fields that are frequently updated automatically, such as last-opened dates.

    d. Back-up data or other data that are substantially duplicative of data that are more accessible elsewhere.

    e. Server, system, or network logs.

    f. Data remaining from systems no longer in use that is unintelligible on the systems in use and where there is no reasonable way to convert the data to a universal format such as CSV, XLSX, TXT, SQL, XML, etc.

This section is not intended to modify any Party's litigation preservation obligations that it may otherwise have under applicable law.

### VI. ESI PRODUCTIONS

1. **General Format of Production.** Documents in these proceedings, whether originally stored in paper or electronic form, shall be produced in native format and in the format specified in this Protocol. Notwithstanding the foregoing provisions of this paragraph, the Parties reserve the right to request that an alternative format or method of production be used for certain

1 Documents, if such Document is not susceptible to production in the format or methods of
2 production addressed herein; if conversion of a Document will render the Document not reasonably
3 usable; or if production in the format described creates an undue burden. In that event, the
4 Receiving Party and the Producing Party will meet and confer to discuss alternative production
5 requirements, concerns, formats, or methods. In the event agreement cannot be reached, the
6 Producing Party and the Receiving Party shall submit their respective positions to the Court via
7 joint motion, and the Court will issue further orders concerning the productions, as necessary.

        2.    **<u>Production Format.</u>** Documents shall be produced according to the following formats, where reasonably feasible:

        a.    <u>Paper documents and documents originally maintained in static image format</u>. Documents that are maintained in paper format or in static image format shall be produced in the static image format and as black and white images at 300 d.p.i. or greater resolution, in a Group 4 compression single-page Tagged Image File Format ("TIFFs" or ".tiff format") with logical unitization (document level breaks) and reflect the full and complete information contained in the original Document. Documents shall also be produced with the associated text created through Optical Character Recognition (OCR), provided, however, that if the Producing Party chooses not to OCR the documents because the Party concludes the expense would outweigh the benefit and where the Producing Party did not maintain OCR text with the documents in the ordinary course of business, the documents will be produced in image format, without OCR. If any documents are produced without OCR, such documents will be identified by Bates number in the production cover letter. If the Producing Party applies OCR to documents, however, then the Producing Party will produce the OCR to the Receiving Party.

/ / /

/ / /

     b.    <u>OCR</u>. When OCR is applied to documents, OCR software should be set to the highest quality setting during processing. Settings such as "auto-skewing" and "autorotation" should be turned on during the OCR process.

     c.    <u>TIFFs</u>. All TIFFs produced by any Party in this matter will be single page Group IV TIFF format, 300 dpi quality or better. Image file names will be identical to the corresponding Bates numbered images, with a ".tiff" file extension. The TIFF settings will be set to show track changes, comments, hidden text and speaker notes, where such information is present in the documents. The Producing Party will brand all TIFF images in the lower right-hand corner with each document's corresponding Bates number, using a consistent font type and size. The Bates number must not obscure any part of the underlying image. If the placement in the lower right-hand corner will result in obscuring the underlying image, the Bates number should be placed as near to that position as possible while preserving the underlying image.

     d.    <u>Text Files</u>. A single text file shall be provided for each document. The text file name shall be the same as the Bates number of the first page of the document with the document extension ".txt" suffixed. File names shall not have any special characters or embedded spaces. Electronic text must be extracted directly from the native electronic file unless the document requires redaction, is an image file, or is any other native electronic file that does not contain text to extract (e.g., non-searchable PDFs). In these instances, and in the case of imaged hard-copy documents, a text file shall be created using OCR, unless the Producing Party chooses not to OCR the documents and OCR was not kept in the ordinary course of business, as noted in paragraph 4(a), above. Extracted text shall be provided in UTF16LE or UTF-8 format and with Byte Order Mark format text where available. For documents that contain track changes, comments, hidden text or speaker notes, the Producing Party will create TIFFs revealing track changes,

comments, hidden text or speaker notes and will OCR those TIFFs so that the text for those documents contains the track changes, comments, hidden text or speaker notes and will produce that OCR text in lieu of extracted text. Text extracted from emails shall include all header information that would be visible if the email was viewed in Outlook including: (1) the individuals to whom the communication was directed ("To"), (2) the author of the email communication ("From"), (3) who was copied and blind copied on such email ("CC" and "BCC"), (4) the subject line of the email ("RE" or "Subject"), (5) the date and time of the email, and (6) the names of any attachments.

e. <u>Embedded Objects</u>. OLE embedded objects (embedded MS Office files, etc.) shall be extracted as separate files and treated as attachments to the parent document. Images embedded in emails need not be extracted and produced separately.

f. <u>Load File</u>. The Producing Party shall produce a load file in Concordance format data (.dat) and Opticon or IPRO format with the Metadata fields identified below, where reasonably available and applicable to the application, unless the documents were maintained originally in static image format or were scanned from hard copy documents and in that case, the fields identified as ESI only will not be produced.

g. <u>Resolution of Production Issues</u>. Documents that a Producing Party discovers cannot be read because of imaging or formatting problems shall be promptly identified by the Receiving Party. The Producing Party and the Receiving Party shall meet and confer to attempt to resolve the problems, to the extent the problems are within the Parties' control.

h. <u>Native Format Documents</u>. The Parties recognize that it may be appropriate for certain Documents to be produced in Native Format. Documents that are originally maintained in native format, including, but not limited to, Excel

spreadsheets, electronic presentations (e.g., PowerPoint), Word documents with tracked changes, audio/video multimedia, and JPEG files shall be provided in Native Format unless there is an agreement to the contrary. Word and PowerPoint documents will also be TIFFed. A Bates numbered placeholder TIFF, bearing the legend "This document has been produced in native format" shall be provided for all ESI produced only in Native Format; these placeholders will be Bates numbered in the same way as any other TIFF, and the Bates number of that single page shall be used as the BegBates and EndBates of the associated document. If there are other files that the Producing Party identifies as not rendering in a readable format to TIFF, the Producing Party will produce those documents in Native Format, where reasonably feasible. If the Receiving Party identifies documents that it believes it needs to review in Native Format, it will request such documents from the Producing Party and the Parties will meet and confer regarding such requests in good faith.

      i.    <u>Color</u>. Paper documents or redacted ESI that contain color necessary to decipher the meaning, context, or content of the document or ESI shall be produced as single page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image.

3. **Document Unitization.** When scanning paper Documents into Document Images as described in paragraph 2(a), they shall be unitized using logical document separation – i.e., separated into separate documents such as a letter as a separate document from its attachment (as maintained in the ordinary course of business), but maintaining the attachment relationship through the use of the Beginning and Ending Bates Attachment fields in the metadata. Document Images generated from responsive attachments to e-mails stored in Native Format shall be produced contemporaneously and sequentially immediately after the parent e-mail. The Producing Party may remove attachments from a responsive family of documents if the attachment is wholly nonresponsive to the discovery requests (e.g., in situations where a calendar invitation, for example,

11

attaches 5 documents related to 5 topics and 4 of the documents and topics discussed are wholly nonresponsive). If nonresponsive documents are removed from a family, the documents will be Bates numbered in the family before removal and a list of the Bates numbers that were removed will be provided in the production cover letter. The Producing Party and the Receiving Party shall meet and confer to attempt to resolve any disputes over withheld documents under this provision, if there are any disputes. In the event the Parties are unable to resolve any such dispute, the Party may seek assistance from the Court. Cover e-mails to responsive documents will be produced regardless of whether they contain separate content that is responsive.

4. **Duplicates.** The Producing Party will de-duplicate its production across the entire production, or by custodian. De-duplication will be performed using the MD5Hash value of the documents and only exact duplicate families will be de-duplicated. If documents are globally de-duplicated (across custodians), a duplicate custodian field will be provided as noted in paragraph 2, above. In the event fields in any de-duplicated document become relevant, the Receiving Party will notify the Producing Party of the specific document(s) at issue. The Parties will meet and confer and the Producing Party will respond to such request as reasonable and appropriate.

5. **Email Threading.** The Parties may use email thread suppression to avoid review and production of information contained within an existing email thread in another document being reviewed and produced, but under no circumstances will email thread suppression remove from production any unique branches and/or attachments contained within an email thread.

6. **File Naming Conventions.**

   a. Document Images. Each Document Image shall be named with the unique Bates number for each page of the Document.

   b. Native Format Documents. Native Format Documents shall be named by Bates number and file extension that correspond to the original Native Format.

7. **Metadata.** The Parties agree that certain metadata fields, where applicable and available, will be produced, including: BegBates, EndBates, BegBatesAttach, EndBatesAttach, FileType, NativeLink, OCRPath.

12

8. **Third Party Documents.** A Party that issues a non-Party subpoena (Issuing Party) shall include a copy of this Stipulation with the subpoena and state that the Parties to the litigation have requested that third parties produce documents in accordance with the specifications set forth herein. The Issuing Party shall produce to the opposing Party or Parties any documents obtained pursuant to a non-Party subpoena. Nothing in this Stipulation is intended or may be interpreted to narrow, expand, or otherwise affect the rights of the Parties or third parties to object to a subpoena.

9. **Modification.** This Order may be modified by agreement/stipulation of the Parties. If the Parties are unable to reach agreement, each Party may submit its position to the Court for relief.

**IT IS SO STIPULATED.**

| BROWNSTEIN HYATT FARBER SCHRECK | OLSON CANNON & GORMLEY |
|---|---|
| BY: */s/ Chelsee C. Jensen* <br> Adam K. Bult, Esq. NV Bar No. 9332 <br> abult@bhfs.com <br> Travis F. Chance, Esq., NV Bar No. 13800 <br> tchance@bhfs.com <br> Chelsee C. Jensen, Esq., NV Bar No. 14549 <br> tchance@bhfs.com <br><br> *Attorneys for Plaintiff Sierra Summit, LLC* | BY: */s/ Max E. Corrick, II* <br> Max E. Corrick, II, Esq., NV Bar No. 6609 <br> mcorrick@ocgattorneys.com <br><br> *Attorneys for Defendant Humphreys & Partners Architects, Nevada, LLC* |

IT IS SO ORDERED.

_____
UNITED STATES MAGISTRATE JUDGE

Dated 10/8/24 _____

13